46 F.3d 1556
 32 U.S.P.Q.2d 1225
 CONOPCO, INC., d/b/a Chesebrough-Pond's USA Co.,
Plaintiff/Cross-Appellant,
v.
MAY DEPARTMENT STORES COMPANY and Venture Stores, Inc.,
and
The Benjamin Ansehl Company,
and
Kessler Containers, Ltd., Defendants-Appellants.
 Nos. 92-1412 to 92-1416.
 United States Court of Appeals,
Federal Circuit.
 Sept. 21, 1994.
Rehearing Denied; Suggestion for
Rehearing In Banc Declined
Nov. 29, 1994.
 
 Berj A. Terzian, Pennie & Edmonds, New York City, argued, for plaintiff/cross-appellant. With him on the brief, were Joseph DiaMante, Peter D. Vogl and Darren W. Saunders.
 Paul F. Kilmer, Gadsby & Hannah, Washington, DC, argued, for defendant-appellant, May Dept. Stores Co. and Venture Stores, Inc. With him on the brief, was Thomas W. Brooke.
 William K. West, Jr., Cushman, Darby & Cushman, Washington, DC, argued, for defendant-appellant, The Benjamin Ansehl Co. With him on the brief, were Mark G. Paulson and Stuart T.F. Huang. Of counsel was Mary M. Bonacorsi, St. Louis, MO.
 Mary M. Bonacorsi, Thompson & Mitchell, St. Louis, MO, argued, for defendant-appellant, Kessler Containers, Ltd. With her on the brief, were Jerome C. Simon, Moser & Marsalek, St. Louis, MO, and William K. West, Jr., Cushman, Darby & Cushman, Washington, DC.
 Before MAYER, MICHEL, and PLAGER, Circuit Judges.
 PLAGER, Circuit Judge.
 
 
 1
 Defendants May Department Stores Co. (May), Venture Stores, Inc. (Venture), The Benjamin Ansehl Co. (Ansehl), and Kessler Containers Ltd. (Kessler) appeal the judgment of the District Court for the Eastern District of Missouri, entered January 2, 1992 after a bench trial. Conopco, Inc. v. May Dep't Stores Co., 784 F.Supp. 648, 24 USPQ2d 1721 (E.D.Mo.1992). The District Court ruled that defendants willfully infringed a package of proprietary rights owned by plaintiff Conopco, Inc. d/b/a Chesebrough-Pond's U.S.A. Co. (Conopco) relating to a relaunch of Conopco's Vaseline Intensive Care Lotion (VICL) product. Those rights consist of (1) the rights conferred by U.S. Patent No. 4,939,179 (the '179 patent), (2) the rights to the VASELINE and INTENSIVE CARE trademarks, U.S. Trademark Registration Nos. 44,790, 140,345, and 864,662, and (3) the rights to the trade dress (container shape and labelling) of the relaunched VICL product pursuant to Sec. 43(a) of the Lanham Act (codified as amended 15 U.S.C. Sec. 1125(a) (1988)). The court awarded plaintiff an injunction, a recall order, enhanced damages of $2,679,201, and prejudgment interest. The court also found the case to be exceptional under 35 U.S.C. Sec. 285 (1988) and 15 U.S.C. Sec. 1117 (1988), and awarded attorney fees and costs. It also imposed joint and several liability on the defendants. The judgment became final on May 26, 1992 when the court denied in all material respects defendants' motions to alter or amend the judgment, or in the alternative, for a new trial. Conopco, Inc. v. May Dep't Stores Co., 797 F.Supp. 740 (E.D.Mo.1992).
 
 
 2
 Plaintiff cross-appeals the court's pre-trial decision dismissing certain state law claims it had asserted against defendants.
 
 
 3
 We affirm-in-part, reverse-in-part, vacate-in-part, and remand with instructions.
 
 BACKGROUND
 
 4
 In 1986, Conopco decided to "relaunch" VICL, a product it had been marketing for over 20 years. Conopco wanted to enhance that product's therapeutic image and to further distance it from private label brands, which had been eroding its sales. Accordingly, it set about developing a new bottle shape and label for the product. It also set about developing a new formula for the lotion. Conopco's objective was to reduce the lotion's greasiness while maintaining its thickness and smooth skin feel.
 
 
 5
 In 1988, Conopco decided upon a revised bottle shape and label for the relaunched product. By 1989, it decided upon a lotion formula. Conopco discovered that the combination of two ingredients--isoparaffin and DEA-cetyl phosphate--resulted in a synergistic increase in the viscosity of the lotion. By adding these two ingredients to its lotion, Conopco found that it could decrease the amount of mineral oil used. Since mineral oil is heavy and greasy, Conopco was thus able to achieve a reduction in greasiness without a corresponding decrease in viscosity.
 
 
 6
 After filing a patent application on the new formula, Conopco initiated the relaunch. It began shipping the product to retailers and aggressively promoting it. By the fall of 1989, the product was on the shelves of virtually every major retailer and drug store in the United States. Between the fall of 1989 and March of 1990, Conopco spent over $37 million to advertise and promote the product.
 
 
 7
 Ansehl is a manufacturer of private label hand lotions, which it distributes through retailers such as Venture, who also handle national brands such as the revised VICL product. Kessler is a manufacturer of containers, and May is Venture's corporate parent.
 
 
 8
 In January 1989, Ansehl became aware of Conopco's plans to relaunch VICL. Accordingly, it developed a private label product to compete with the revised VICL product. Together with Kessler, it developed a container for the product. In conjunction with Venture, it developed the labelling that would be affixed to the container. Soon after Conopco initiated the VICL relaunch, Ansehl began marketing its product through several retailers, including Venture.
 
 
 9
 In March 1990, Conopco sent Venture a letter asserting that the Ansehl product infringed the proprietary rights Conopco had then accumulated in the revised VICL product (trademark and trade dress). In May 1990, May, Venture's parent, responded denying infringement of those rights.
 
 
 10
 On July 3, 1990, Conopco's patent on the new lotion formula, the '179 patent, issued. The sole independent claim in that patent is claim 1, which reads:
 
 
 11
 1. An aqueous cosmetic emulsion comprising:
 
 
 12
 i) an isoparaffin;
 
 
 13
 ii) a C sub8 -C sub22 alkyl phosphate salt;
 
 
 14
 wherein the isoparaffin and alkyl phosphate salt are present in a respective weight ratio of from about 40:1 to about 1:1, and said emulsion having a viscosity ranging from 35 to about 90 Brookfield units as measured with a Brookfield Viscometer Model LVT using a # 4 spindle rotating at 60 rpm at 25? C.
 
 
 15
 In August 1990, Conopco filed suit against the defendants in the District Court for the Eastern District of Missouri. Conopco's complaint contained six counts. Count one alleged infringement by defendants Ansehl, May, and Venture of the '179 patent; count two alleged infringement by Ansehl, May, and Venture of the VASELINE and INTENSIVE CARE trademarks; count three alleged trade dress infringement by all defendants; and counts four through six were state law counts.
 
 
 16
 In March 1991, in the decision that gave rise to Conopco's cross-appeal, the District Court dismissed without prejudice the state law counts (counts four through six) Conopco had asserted. The court found that complete diversity was lacking between plaintiff and defendants and that the only basis upon which it could conceivably exercise jurisdiction was pendent jurisdiction. However, it declined to exercise such jurisdiction on the ground that the state law issues would predominate over the federal issues.
 
 
 17
 On January 2, 1992, the court, in the decision that gave rise to defendants' appeals, entered after a bench trial judgment in favor of plaintiff. Conopco, Inc. v. May Dep't Stores Co., 784 F.Supp. 648, 24 USPQ2d 1721 (E.D.Mo.1992). The court found that defendants Ansehl, Venture, and May willfully infringed the '179 patent, both literally and under the doctrine of equivalents, and that all defendants had willfully infringed plaintiff's trademark and trade dress rights. The court found the case to be exceptional, and that enhanced damages were warranted. The court awarded plaintiff trebled damages of $2,397,579 for the patent infringement, and trebled damages of $281,622 for the trademark and trade dress infringement. The court also awarded costs, attorney fees, prejudgment interest, a recall order, and an injunction. It also imposed joint and several liability on the defendants. These appeals followed.
 
 DISCUSSION
 A. Patent Infringement Issues
 1.
 
 18
 We first address the literal infringement issue. Defendants argue that the court erred in its analysis of this issue because it adopted an unduly broad interpretation of the "about 40:1" limitation in the '179 claims. For example, the trial court considered a formulation with a ratio of 162.9:1 to be within the literal scope of the claim, in part on the theory that "about" allows a range to extend as far as the prior art would allow.[1] Had the court interpreted that limitation properly, argue defendants, it would have reached the opposite conclusion on the literal infringement question.
 
 
 19
 Defendants are correct. There is simply no basis for interpreting the phrase "about 40:1" to encompass the 162.9:1 ratio. That would imply an expansion of the term "about" to encompass over a fourfold increase in the specified numerical ratio and thus would ignore the ordinary meaning of that term.[2] Although, as we have repeatedly said, a patentee can be his own lexicographer, the words of a claim "will be given their ordinary meaning unless it appears that the inventor used them differently." ZMI Corp. v. Cardiac Resuscitator Corp., 844 F.2d 1576, 1579, 6 USPQ2d 1557, 1560 (Fed.Cir.1988) (citing Envirotech Corp. v. Al George, Inc., 730 F.2d 753, 759, 221 USPQ 473, 477 (Fed.Cir.1984)). The '179 specification and prosecution history do not support the argument that the inventors used this term differently from its ordinary meaning. For example, the specification emphasizes the criticality of the claimed ratio[3]:
 
 
 20
 According to the present invention it is important to incorporate isoparaffin and alkyl phosphate salt in a relative weight ratio which falls within the range from about 40:1 to about 1:1, preferably from about 20:1 to about 4:1, optimally between about 10:1 and about 6:1.
 
 
 21
 By selection of isoparaffin and alkyl phosphate salt as well as careful control of the relative ratios, it has become possible to thicken an aqueous system with a minimum amount of oily material. (Emphasis added.)
 
 
 22
 It also suggests that adherence to the 40:1 to 1:1 range was at least partly responsible for the favorable skin feel test results that had been obtained for the claimed lotion.[4] In the prosecution history, Conopco also emphasized the criticality of the claimed ratio. In response to an office action, Conopco stated that the object of the claimed invention--providing a cosmetic emulsion having enhanced viscosity while avoiding greasiness--"was achieved by utilizing a combination of isoparaffin and an alkyl phosphate salt in a ratio from about 40:1 to about 1:1."
 
 
 23
 Thus, one of skill in the art, the vantage point from which the proper interpretation of a claim is ultimately determined[5], would have no reason to believe that the term "about" meant other than what it says; on the contrary, there would be every reason to believe that the term should be given its ordinary meaning. That interpretation does not permit an expansion of the claimed 40:1 ratio by over a factor of four.
 
 
 24
 Conopco argues that an expansive interpretation of the term is not precluded by the prior art. That misses the point. The relevant inquiry, as noted, is whether one of skill in the art would have understood that the term was to be read expansively. The fact that an expansive definition is not precluded by the prior art is not dispositive of this inquiry.
 
 
 25
 Conopco argues that Kolene Corp. v. Motor City Metal Treating, Inc., 440 F.2d 77, 169 USPQ 77 (6th Cir.), cert. denied, 404 U.S. 886, 92 S.Ct. 203, 30 L.Ed.2d 169 (1971) compels a different result. The claim at issue in that case was a process claim requiring the use of a bath having a cyanate content of between "about 25 and 40%." The accused process employed a bath having a cyanate content in the range of 46 and 50%. The 40% upper limit of the claimed range was not critical, and the term "about" only had to be stretched a modest amount to encompass the cyanate content of the accused process. Id. at 82, 169 USPQ at 81. Thus, a finding that the accused process literally infringed did not unduly interfere with the intended function of the claims, and did not eviscerate the plain meaning of the term "about." That is not the case here.
 
 2.
 
 26
 The District Court found that the 162.9:1 formulation infringed under the doctrine of equivalents because it met the function/way/result test set forth in Graver Tank & Mfg. Co. v. Linde Air Prods. Co., 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 reh'g denied, 340 U.S. 845, 71 S.Ct. 12, 95 L.Ed. 620 (1950). Defendants argue that this finding is clearly erroneous. Defendants are correct.
 
 
 27
 The doctrine of equivalents cannot be used to erase "meaningful structural and functional limitations of the claim on which the public is entitled to rely in avoiding infringement." Pennwalt Corp. v. Durand-Wayland, Inc., 833 F.2d 931, 935, 4 USPQ2d 1737, 1739 (Fed.Cir.1987) (en banc ), cert. denied, 485 U.S. 1009, 108 S.Ct. 1474, 99 L.Ed.2d 703 (1988) (quoting Perkin-Elmer Corp. v. Westinghouse Elec. Corp., 822 F.2d 1528, 1532, 3 USPQ2d 1321, 1324 (Fed.Cir.1987)); see also Graver Tank, 339 U.S. at 610, 70 S.Ct. at 857 (doctrine of equivalents inapplicable in the case of a substantial change between limitation recited in claim and corresponding element in accused product). That would be the effect of concluding that the 162.9:1 formulation infringes under the doctrine of equivalents. As noted, the "about 40:1" limitation is a meaningful limitation in the claim. A conclusion that the 162.9:1 formulation infringes under the doctrine of equivalents would eviscerate the plain meaning of that limitation.
 
 
 28
 Conopco argues that Kolene again compels a different result. But that case involved a judgment of literal infringement, Kolene, 440 F.2d at 82, 169 USPQ at 81, and is of questionable relevance on the doctrine of equivalents issue presented here. Moreover, in that case the accused infringer specifically chose to operate at the 46 to 50% level to skirt the language of the claims while appropriating the benefits of the patented invention. That is not the situation here.
 
 3.
 
 29
 For all the foregoing reasons, we reverse the judgment of patent infringement, both literal and under the doctrine of equivalents, as it relates to the 162.9:1 formulation, but affirm that judgment as it relates to the 20:1 and 40:1 formulations. (See note 1, supra.)
 
 
 30
 Since the bulk of defendants' activity which formed the basis for the court's judgment on the patent infringement question involved the 169.2:1 formulation, we vacate the court's award of an injunction, recall order, damages, attorney fees, costs, and prejudgment interest as they relate to this issue. In addition, the finding of willfulness, the determination that enhanced damages are warranted, and the determination that the case is exceptional are vacated as they relate to the patent infringement question.
 
 
 31
 In view of our affirmance of the judgment of infringement in relation to the 20:1 and 40:1 formulations, the case is remanded to the District Court with instructions to reconsider what remedies might be appropriate, and for reconsideration of the willfulness, enhanced damages, exceptional case, and attorney fees issues as they relate to patent infringement. In resolving the willfulness, enhanced damages, exceptional case, and attorney fees issues, the court is cautioned not to place undue weight on defendants' activities prior to the issuance of the patent. Although these activities may have been undertaken with knowledge that a patent application covering the relaunched lotion formulation was pending (in view of the "patent pending" notice affixed to the relaunched product), that is insufficient to support a finding of willfulness. See State Indus., Inc. v. A.O. Smith Corp., 751 F.2d 1226, 1236, 224 USPQ 418, 425 (Fed.Cir.1985). In resolving the damages issue, we caution the court to take account of the marking provisions of 35 U.S.C. Sec. 287(a) (1988) in view of our recent decisions in Amsted Industries Inc. v. Buckeye Steel Castings Co., 24 F.3d 178, 30 USPQ2d 1462 (Fed.Cir.1994) and American Medical Systems Inc. v. Medical Engineering Corp., 6 F.3d 1523, 28 USPQ2d 1321 (Fed.Cir.1993), cert. denied, --- U.S. ----, 114 S.Ct. 1647, 128 L.Ed.2d 366 (1994). Since Conopco did not mark its product with the '179 patent number, defendants are not liable for patent infringement damages prior to the date they had actual notice of the '179 patent. Amsted, 24 F.3d at 187-88, 30 USPQ2d at 1469-70; American Medical Systems, 6 F.3d at 1537, 28 USPQ2d at 1331.
 
 
 32
 B. Trade Dress and Trademark Infringement Issues
 
 
 33
 The trade dress and trademark infringement issues raise substantive legal issues over which this court does not have exclusive subject matter jurisdiction.[6] Accordingly, it is our practice to defer to the law of the regional circuit in which the district court sits, in this case the Eighth Circuit, to resolve them. See Payless Shoesource, Inc. v. Reebok Int'l Ltd., 998 F.2d 985, 987, 27 USPQ2d 1516, 1518 (Fed.Cir.1993).
 
 1. Trade Dress
 
 34
 Conopco's trade dress infringement claim was brought pursuant to section 43(a) of the Lanham Act (codified as amended at 15 U.S.C. Sec. 1125(a) (1988)). Conopco seeks injunctive and monetary relief. In the Eighth Circuit, the elements to be proved in a claim for trade dress infringement differ depending on whether injunctive or monetary relief is being sought. See Woodsmith Publishing Co. v. Meredith Corp., 904 F.2d 1244, 1247 n. 5, 15 USPQ2d 1053, 1055 n. 5 (8th Cir.1990); Co-Rect Products, Inc. v. Marvy! Advertising Photography, Inc., 780 F.2d 1324, 1329-30, 228 USPQ 429, 432 (8th Cir.1985). To establish entitlement to monetary relief, a plaintiff must show actual confusion, while to establish entitlement to injunctive relief, it is sufficient if the plaintiff establishes likelihood of confusion. Woodsmith, 904 F.2d at 1247 n. 5, 15 USPQ2d at 1055 n. 5. The difficulty of proving actual confusion understandably is greater than that of proving likelihood of confusion. See PPX Enters. v. Audiofidelity Enterprises, 818 F.2d 266, 271, 2 USPQ2d 1672, 1675 (2d Cir.1987); Schutt Mfg. Co. v. Riddell, Inc., 673 F.2d 202, 206, 216 USPQ 191, 194 (7th Cir.1982). We consider first Conopco's claim for monetary relief, then its claim for injunctive relief.
 
 
 35
 a. Monetary Relief--Actual Confusion
 
 
 36
 In the Eighth Circuit, the question of actual confusion vel non is one of fact subject to the clearly erroneous standard of review. Prufrock Ltd., Inc. v. Lasater, 781 F.2d 129, 132-33, 228 USPQ 435, 437 (8th Cir.1986) (discussing standard of review for trade dress infringement claim). The trial court based its finding of actual confusion on two factors. The first is the testimony of a consumer, Mrs. Sickles. The second is a presumption of actual confusion arising from the "overwhelming evidence that defendants intended to deceive and confuse the public in connection with the Venture skin care lotion product." (CL80)
 
 
 37
 In her testimony, Mrs. Sickles stated that she purchased a private label brand of VICL--the Target brand[7]--thinking it to have originated from Conopco. The problem with the testimony is that Mrs. Sickles' confusion arose at least in part from her assumption, erroneous as applied to this case, that national brand manufacturers secretly market private label brands. First, there is no evidence that this assumption is widely held by the relevant consumers, the vantage point from which the confusion issue must ultimately be addressed. Second, under the circumstances of this case, in which the national brand is being sold side-by-side with the private label brand, the assumption is at best counter-intuitive--it assumes that a national brand manufacturer would embark on a scheme to deliberately erode its sales of the national brand.[8]
 
 
 38
 Thus, Mrs. Sickles' experience appears to have been atypical and an isolated incident. Isolated instances of actual confusion do not justify an award of monetary relief when there is a reasonable explanation in the record which serves to discount their importance. See Harad v. Sears, Roebuck & Co., 204 F.2d 14, 19, 97 USPQ 93, 97 (7th Cir.), cert. denied, 346 U.S. 914, 74 S.Ct. 274, 98 L.Ed. 410 (1953); see also Woodsmith Publishing Co., 904 F.2d at 1249, 15 USPQ2d at 1057; Amstar Corp. v. Domino's Pizza, Inc., 615 F.2d 252, 263, 205 USPQ 969, 978-79 (5th Cir.), cert. denied, 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980). Accordingly, that testimony is legally insufficient to sustain the court's award of monetary relief.[9]
 
 
 39
 Actual confusion is normally proven "through the use of direct evidence, i.e., testimony from members of the buying public, as well as through circumstantial evidence, e.g., consumer surveys or consumer reaction tests." PPX Enters. v. Audiofidelity Enterprises, 818 F.2d 266, 271, 2 USPQ2d 1672, 1675 (2d Cir.1987). A presumption of actual confusion arising from an intent to deceive is neither. Thus, the question is whether such a judicially-created presumption constitutes a sufficient basis to sustain the trial court's award of monetary relief.
 
 
 40
 In the absence of any Eighth Circuit authority supporting such a presumption, the trial court based the existence of the presumption on three Second Circuit cases, a Ninth Circuit case, and an excerpt from a treatise: My-T Fine Corp. v. Samuels, 69 F.2d 76 (2d Cir.1934); Getty Petroleum Corp. v. Island Transp. Corp., 878 F.2d 650, 11 USPQ2d 1334 (2d Cir.1989); PPX Enterprises v. Audiofidelity Enterprises, 818 F.2d 266, 2 USPQ2d 1672 (2d Cir.1987); U-Haul Intern., Inc. v. Jartran, Inc., 601 F.Supp. 1140, 225 USPQ 306 (D.Ariz.1984), aff'd-in-part, rev'd-in-part, and mod.-in-part, 793 F.2d 1034, 230 USPQ 343 (9th Cir.1986); and 2 J. Thomas McCarthy, Trademarks and Unfair Competition Sec. 30:25, at 500 (1984). However, a careful evaluation of this material shows that it does not support the court's conclusion.
 
 
 41
 My-T Fine involved a trademark infringement case[10] in which only injunctive relief was sought. Although the court concluded that likelihood of confusion could be presumed from an intention to copy, 69 F.2d at 77, the question of whether a similar presumption could be drawn in the case of actual confusion was not an issue in the case.
 
 
 42
 Getty involved a case in which non-Getty gasoline was being sold to consumers under the Getty trademark. In determining whether an award of punitive damages for trademark infringement was sustainable, the court acknowledged the differing elements to be proved depending upon whether monetary or injunctive relief was being sought. 878 F.2d at 656, 11 USPQ2d at 1338. Citing PPX, infra, it ultimately concluded that the award was sustainable under the limited circumstances of that case, despite plaintiff's failure to provide consumer witnesses or surveys in relation to the issue of actual confusion. As the court put it: "Consumer witnesses or surveys are not a sine qua non of proof of actual confusion in a case where the product falsely presented cannot be meaningfully inspected by the consumer." Id. at 656, 11 USPQ2d at 1339. Since the court's holding was expressly limited to the special circumstances of that case, including the fact that consumers could not inspect the competing goods, circumstances which are not present here, Getty is inapposite.
 
 
 43
 PPX involved a case for false advertising brought under section 43(a) of the Lanham Act. The defendant was marketing records, the jackets of which falsely represented Jimi Hendrix's involvement in the songs recorded thereon. The question was whether the trial court's award of monetary relief was sustainable despite plaintiff's failure to proffer consumer testimony or surveys showing actual confusion. In concluding that the award of monetary relief was sustainable, the court drew a distinction between a claim for false advertising and other claims cognizable under section 43(a) of the Lanham Act, such as a claim for 'palming off'--false designation of origin, the claim at issue in this case. Id. 818 F.2d at 272, 2 USPQ2d at 1676. In a case involving false advertising, said the court, the traditional difference between a claim for injunctive relief and one for monetary relief has less relevance. Id. at 272, 2 USPQ2d at 1677. However, the court did not disturb the significance of this difference in a case involving a claim for false designation of origin. Thus, PPX, as well, is inapposite.
 
 
 44
 U-Haul is a Ninth Circuit case also involving a claim for false advertising. The court applied the rule that "[p]ublication of deliberately false comparative claims gives rise to a presumption of actual deception and reliance." 601 F.Supp. at 1149, 225 USPQ at 311, aff'd, 793 F.2d at 1041, 230 USPQ at 348. The court did not purport to apply this rule to a case involving a claim of palming off or false designation of origin. Thus, it provides no support for the trial court's conclusion.
 
 
 45
 Finally, the McCarthy treatise notes that there are courts that require some proof of actual confusion for a recovery of damages, and some that, "in some situations will make a monetary award where defendant is a willful infringer or an outright pirate or counterfeiter." 2 J. Thomas McCarthy, supra, Sec. 30:25, at 499-500. The treatise hardly supports or establishes the conclusion that the Eighth Circuit is one of the jurisdictions that recognizes the presumption, or that it should be applied in these circumstances.
 
 
 46
 This is a case in which a retailer markets a national brand product and at the same time markets its own private label product in direct competition. The retailer packages its product in a manner to make it clear to the consumer that the product is similar to the national brand, and is intended for the same purposes. At the same time, the retailer clearly marks its product with its private logo, and expressly invites the consumer to compare its product with that of the national brand, by name.
 
 
 47
 With the rise of regional and national discount retailers with established names and logos, retailers who market both national brands and their own private label brands in direct competition, this form of competition has become commonplace and well-known in the marketplace. When such packaging is clearly labelled and differentiated--as was the case here, see the discussion in the next section--we are unwilling to attribute to the Eighth Circuit, absent clear precedent so requiring, a rule that would make such competition presumptively unlawful.
 
 
 48
 The District Court erred in concluding that under Eighth Circuit law actual confusion could be presumed from defendants' intent to copy the overall package design. Consequently, there is a complete absence of proof of actual confusion, the required element in plaintiff's claim for monetary relief. The court's award of monetary relief is thus not sustainable, and is reversed.
 
 
 49
 b. Injunctive Relief--Likelihood of confusion
 
 
 50
 In the Eighth Circuit, a finding of likelihood of confusion involves consideration of at least the following six factors: (1) strength of the plaintiff's mark; (2) similarity of the plaintiff's and defendant's marks; (3) similarity of the products; (4) the competitive proximity of the products; (5) the defendant's intent; and (6) instances of actual confusion. See SquirtCo v. Seven-Up Co., 628 F.2d 1086, 1091, 207 USPQ 897, 900 (8th Cir.1980) as applied in Calvin Klein Cosmetics Corp. v. Parfums de Coeur, Ltd., 824 F.2d 665, 668, 3 USPQ2d 1498, 1500 (8th Cir.1987). Likelihood of confusion is, as actual confusion, a question of fact subject on appeal to the clearly erroneous standard. Squirtco, 628 F.2d at 1091, 207 USPQ at 900 as applied in Calvin Klein, 824 F.2d at 668, 3 USPQ2d at 1500.
 
 
 51
 The trial court concluded that likelihood of confusion had been established on the basis of the following findings: that plaintiff's marks are strong (CL71), the trade dress of the two products is "extremely similar" (CL73), the two products are "directly competitive" (CL76), the defendants "acted with deliberate intent to imitate and infringe the revised VICL trade dress" (CL77), a presumption of likelihood of confusion arising from defendants' intent to deceive and copy (CL95), and the presence of actual confusion (CL94). As noted, supra, the court's finding of actual confusion was erroneous because of a complete failure of proof. Thus, our task is to determine whether the other findings are sufficient to support the court's finding of likelihood of confusion.
 
 
 52
 We conclude that they are not. Even accepting these other findings as true, they are at best merely inferentially or presumptively relevant to the likelihood of confusion issue. A factor more probative of that issue, which the court in its opinion failed to address, is the significance of the black and white diagonally-striped Venture logo prominently situated on the front of the original and relaunched Venture products. Photographs comparing the original and relaunched Conopco products with the corresponding Venture products, reproduced below, show the prominent placement of that logo on the front of the Venture products:NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLEThe unique and extensive appearance of that logo in the store parking lot, on store signs, on employees' badges, in Venture's frequent and periodic print and television advertisements, and on other private label items sold by Venture[11], the large volume of Venture's annual sales ($1.3 billion in 1990), and the dearth of evidence that consumers ever purchased the Venture brand thinking it to have originated from Conopco despite the extended (over 10 year) period over which the original and relaunched products were sold alongside the Venture brand, give rise to the expectation that consumers identify the logo with Venture, rather than Conopco, and use that logo to successfully distinguish between the two brands.[12]
 
 
 53
 The fact that Venture (and other retailers) compete in the manner described, which is all that the evidence establishes, is simply insufficient to amount to proof that there is in the minds of consumers a likelihood of confusion about whose product is whose. The same point has been made in a number of recent cases: L.A. Gear, Inc. v. Thom McAn Shoe Co., 988 F.2d 1117, 25 USPQ2d 1913 (Fed.Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 291, 126 L.Ed.2d 240 (1993); Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc., 973 F.2d 1033, 24 USPQ2d 1161 (2d Cir.1992); Oreck Corp. v. U.S. Floor Systems, Inc., 803 F.2d 166, 231 USPQ 634 (5th Cir.1986), cert. denied, 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987); Litton Systems, Inc. v. Whirlpool, Corp., 728 F.2d 1423, 221 USPQ 97 (Fed.Cir.1984); Amstar Corp. v. Domino's Pizza, Inc., 615 F.2d 252, 205 USPQ 969 (5th Cir.), cert. denied, 449 U.S. 899, 101 S.Ct. 268, 66 L.Ed.2d 129 (1980); and Warner Lambert Co. v. McCrory's Corp., 718 F.Supp. 389, 12 USPQ2d 1884 (D.N.J.1989). See also Life Indus. Corp. v. Star Brite Distrib. Inc., 31 F.3d 42, 46-48, 31 USPQ2d 1536, 1540 (2d Cir.1994).
 
 
 54
 In L.A. Gear, this court, applying regional circuit law, reversed the judgment of the trial court that the overall appearances of several models of defendant's athletic shoes, admitted copies of plaintiffs' athletic shoe, were confusingly similar to the overall appearance of plaintiffs' shoe in contravention of section 43(a) of the Lanham Act. Although the rule, that intentional copying of trade dress creates a presumption of confusing similarity, was applicable, 988 F.2d at 1132, 25 USPQ2d at 1924, we found erroneous the district court's conclusion that the prominent placement of well-known trademarks on plaintiffs' and defendant's shoes did not dispel or overcome the presumption:
 
 
 55
 We conclude that the conspicuous and permanent placement of the trademarks of [plaintiff] L.A. Gear as well as the copyist, and the sophistication of purchasers of fashion athletic shoes, clearly outweigh the similarities in the shoe design, insofar as consumer confusion as to source is avoided. We think the district court was mistaken in viewing these consumers as unsophisticated and casual in their purchases. We agree with Appellants that purchasers of fashion athletic shoes are likely to be well aware of the sources of such shoes, when such sources are conspicuously marked on the shoes by both copier and originator.
 
 
 56
 Id. at 1134, 25 USPQ2d at 1926.
 
 
 57
 Similarly, in Bristol-Myers, the appellate court reversed the judgment of the district court that the trade dress used in connection with defendant's analgesic pain reliever--in which the phrase "Tylenol PM" was prominently featured--was confusingly similar to that used in connection with plaintiff's analgesic pain reliever--in which the phrase "Excedrin PM" was prominently featured. 973 F.2d at 1046, 24 USPQ2d at 1170. Although it sustained the trial court's findings that the defendant was a copyist, and that the parties' respective trade dress was similar, id. at 1046, 24 USPQ2d at 1170, the court nonetheless concluded that a reversal was appropriate in view of the prominent placement of the parties' names on their respective packages:
 
 
 58
 Despite the similarity between certain aspects of the two trade dresses, when taken as a whole, including the prominently displayed names, they are not similar in any manner that is likely to cause confusion; in fact, the prominent presence of well known trade names goes far toward countering any suggestion of consumer confusion arising from any of the other ... factors.
 
 
 59
 * * * * * *
 
 
 60
 Even McNeil's bad faith in adopting many elements of the "Excedrin PM" trade dress does not alter that conclusion. Absence of good faith, like the other ... factors, is not by itself dispositive in any given case. (citations). The prominent placement of the "Tylenol" name goes far toward countering any suggestion that McNeil intended to confuse its customers as to the source of its product. We believe that even "low involvement" consumers will have a hard time missing the famous names that form the most prominent feature of the trade dress in each case. It is thus not surprising that Bristol was unable to present any meaningful evidence of actual confusion between the two products.
 
 
 61
 Id. at 1046-47, 24 USPQ2d at 1170-71.
 
 
 62
 In Oreck, the court said that the inability to point to a single instance of actual confusion, despite concurrent use of the marks in question for seventeen months, is "highly significant." 803 F.2d at 173, 231 USPQ at 639.
 
 
 63
 In Litton, this court reversed a finding of likelihood of confusion on the ground that the prominence of the parties' names affixed to the two products in question--Whirlpool and Litton microwave ovens--overcame any presumption or inference of likelihood of confusion arising from the similarity of the two products:
 
 
 64
 Likelihood of confusion cannot, however, be founded on mere similarity between products....
 
 
 65
 * * * * * *
 
 
 66
 The accused Whirlpool ovens, in particular, conspicuously display the word "Whirlpool" not just once, but three times on the front, and in moderately large letters too. Likewise, the name "Litton" appears conspicuously on the front of the Litton ovens.
 
 
 67
 * * * * * *
 
 
 68
 [W]hy affixing a name is not sufficient to avoid likelihood of confusion should be shown by the plaintiff, and not assumed by the trial judge. The district court made no findings ... as to how a purchaser confronted with a correct brand or maker's name could still be confused or deceived. Nor can we find any basis from the record for determining that there is a likelihood of confusion, when the labelling of the ovens is considered.
 
 
 69
 * * * * * *
 
 
 70
 The decision of the trial judge is wrong because it assigns no weight to the practice of the trade ... of placing the maker's or brand name conspicuously on the front of the microwave oven and the practice of Whirlpool, in particular, in exceeding, not falling behind the others, in the display of its own name.
 
 
 71
 728 F.2d at 1446-47, 221 USPQ at 111-12.
 
 
 72
 In Amstar, the appellate court reversed the trial court's judgment that defendants, through their use of trade dress in which the phrase "Domino's Pizza" was prominently featured, had infringed under section 43(a) of the Lanham Act plaintiff's rights in its trade dress, in which the mark "Domino" was prominently featured. Although the governing standard of review in relation to the likelihood of confusion issue was the 'clearly erroneous' standard, id. 615 F.2d at 258, 205 USPQ at 974, the court nonetheless concluded that the standard had been met in part because the plaintiff had provided only minimal evidence of actual confusion despite the extended time period (nearly 15 years) during which the two products had been concurrently marketed. Id. at 263, 205 USPQ at 979. As the court put it:
 
 
 73
 Indeed, the fact that only three instances of actual confusion were found after nearly 15 years of extensive concurrent sales under the parties' respective marks raises a presumption against likelihood of confusion in the future.
 
 
 74
 Id. at 263, 205 USPQ at 979.
 
 
 75
 In Warner Lambert, the trial court denied a motion for a preliminary injunction seeking to enjoin defendant's use of a trade dress in connection with a private label mouthwash which allegedly was confusingly similar to plaintiff's trade dress in contravention of section 43(a) of the Lanham Act. In determining that the plaintiff had made an insufficient showing of likelihood of confusion, the court took cognizance of the extensive experience relevant consumers had had with private label brands:
 
 
 76
 [T]he price difference between the two products is not only a product difference in itself, but also prompts [defendant] McCrory to bring this price difference to the consumers attention through the prominent use of "compare and save" signs on shelves in which the products appear, further distinguishing the two products from each other in the minds of prospective consumers. The Court also takes cognizance of the fact that a McCrory's shopper, as with any shopper in such a retail store chain, has likely been exposed to generic or house brands before, and when walking through a McCrory's store and observing the many "compare and save" signs, is not likely to be misled by the McCrory's mouthwash brand.
 
 
 77
 Id. 718 F.Supp. at 399, 12 USPQ2d at 1891.
 
 
 78
 Finally, in Life Industries, the Second Circuit overturned the trial court's finding that there was a likelihood of confusion between the trade dress of the parties' boat caulking products in part because of the absence of evidence of actual confusion. As the court put it: "Life has failed to present any evidence of actual confusion. Although such evidence is difficult to obtain and is not a prerequisite to finding likelihood of confusion, its absence nevertheless weighs against that finding." 31 F.3d at 47, 31 USPQ2d at 1540 (citing McGregor-Doniger Inc. v. Drizzle Inc., 599 F.2d 1126, 1136, 202 USPQ 81, 91 (2d Cir.1979)).
 
 
 79
 As the above discussion shows, the marketing device employed by defendants in this case is neither new nor subtle. The cases have approved the general practice in a variety of settings, at least to the extent of not finding a violation of the Lanham Act absent a showing by the plaintiff that real consumers have real confusion or likelihood of it with regard to the origin of the products involved. We are thus left with a "definite and firm conviction" that the District Court erred in concluding that likelihood of confusion had been established. United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948); see also Colorado v. New Mexico, 467 U.S. 310, 316, 104 S.Ct. 2433, 2437-38, 81 L.Ed.2d 247 (1984). The court thus clearly erred in awarding injunctive relief, and the judgment of the court in that regard is reversed. We reverse the court's judgment of trade dress infringement, and its award of costs, attorney fees, and prejudgment interest as they relate to this issue. We further reverse the court's finding of willfulness, the determination that the case is exceptional, and the determination that enhanced damages are warranted as they relate to trade dress infringement. The injunction and recall order are vacated as they relate to this issue.
 
 
 80
 The dissent's point--that we have impermissibly reweighed the evidence and intruded on the fact finding role of the trial court--is incorrect. With the exception of the court's finding in relation to actual confusion, our quarrel is not with any of the court's underlying findings of fact. Our point is that--in view of the prominent placement of the Venture logo on the front of the Venture product, the extensive exposure consumers have had to that logo, and the extended time period over which consumers have been able to distinguish the Venture and Conopco brands without any apparent confusion--the findings made by the court do not support a conclusion that consumers associate the Venture brand with Conopco, rather than with Venture. As the Eighth Circuit has noted, "[i]n unfair competition cases, the dispute between the parties usually 'centers on the interpretation to be given to the facts--not the facts themselves or the inferences that can be drawn from the facts.' " Woodsmith Publishing Co., 904 F.2d at 1247, 15 USPQ2d at 1055.
 
 2.
 
 81
 Conopco's trademark infringement claim was brought pursuant to Sec. 32 of the Lanham Act (codified as amended at 15 U.S.C. Sec. 1114(1)(a) (1988)). As with trade dress infringement, actual or likelihood of confusion (depending upon whether monetary or injunctive relief is being sought) is an element of trademark infringement. See SquirtCo, 628 F.2d at 1091, 207 USPQ at 900. A factor relevant to actual and likelihood of confusion is the manner in which the mark is used by the accused infringer. See Calvin Klein, 824 F.2d at 668, 3 USPQ2d at 1500. If the use of the mark is truthful and unlikely to confuse consumers as to the source of the product, then the use is permissible. Id. In light of the prominent placement of the Venture logo on the face of the Venture product, and the context in which the marks appear, i.e., a 'Compare' statement, defendants' use of the Conopco marks draws a clear distinction between their product and Conopco's. The record is simply devoid of evidence to support findings of actual and likelihood of confusion here as well. Accordingly, the court erred in finding trademark infringement.
 
 
 82
 We reverse the court's judgment of trademark infringement. We also reverse the court's award of an injunction, a recall order, and damages as they relate to this issue. We also reverse the court's finding of willfulness, the determination that enhanced damages are warranted, the determination that the case is exceptional, and the court's award of attorney fees, costs, and prejudgment interest as they relate to this issue.[13] The injunction and recall order are vacated as they relate to trademark infringement.
 
 C. The Cross-Appeal
 
 83
 Conopco asserts that the court erred in dismissing its state law claims, and in declining to exercise pendent jurisdiction over Conopco's state law claims. The determination of whether to exercise pendent jurisdiction is a matter within the district court's discretion.[14] United Mine Workers v. Gibbs, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966). The District Court declined to exercise pendent jurisdiction because Conopco's state law claims were brought pursuant not only to Missouri law but to the common law of every other state. The court found that the state law issues were not clearly related to the federal issues and predominated over those issues.
 
 
 84
 We cannot say the court abused its discretion. As the Supreme Court has stated, "if it appears that the state issues substantially predominate, whether in terms of proof, or the scope of the issues raised, or of the comprehensiveness of the remedy sought, the state claims may be dismissed without prejudice and left for resolution to state tribunals." Id. at 726-27, 86 S.Ct. at 1139. The District Court is affirmed on this issue.CONCLUSION
 
 
 85
 We have considered the remaining arguments raised by the parties and find them either unpersuasive or not dispositive.
 
 
 86
 For all the foregoing reasons, we reverse-in-part, affirm-in-part, vacate-in-part, and remand with instructions.
 
 COSTS
 
 87
 Each party to bear its own costs.
 
 
 88
 MAYER, Circuit Judge, concurring in part and dissenting in part.
 
 
 89
 I would affirm to the extent the district court held defendants liable for infringement of Conopco's trade dress and trademark rights. I see no clear error in that court's finding that there is a likelihood of confusion between defendants' packaging and the trade dress of the relaunched VICL product. I also see no error in the finding that defendants' use of Conopco's registered trademarks was likely to cause confusion among the relevant class of consumers.
 
 
 90
 This court's contrary conclusion on likelihood of confusion is reached by impermissibly reweighing the evidence that was before the trial court. This is not only beyond its competence but intrudes on the fact finding role of the district court and encourages litigants to ignore the outcome of the trial and retry the case on appeal. Sometimes, like here, it works.
 
 
 91
 The trial court properly applied the factors set out in Squirtco v. Seven-Up Co., 628 F.2d 1086, 1091, 207 USPQ 897, 900 (8th Cir.1980), to determine whether a likelihood of consumer confusion exists.[1] Likelihood of confusion is a matter of fact and such factual findings are entitled to considerable deference and cannot be reversed unless clearly erroneous. Id. The findings are comprehensive, amply supported by the evidence in the record, are not clearly erroneous, and provide a sufficient basis for the determination that a likelihood of confusion exists.
 
 
 92
 The district court explained that defendants' employee, Bowers, testified it was "a major directive [of the company] to obtain the new VICL product" and that he was instructed "to make the revised skin care packaging as close as possible to the VICL packaging." Conopco, 784 F.Supp. at 659 (district court's findings of fact (FF) 54-55). The court further found as evidence of defendants' intentional conduct that, without adequate explanation, they failed to place the well known "Venture" name on the front of the package but instead placed only the VASELINE and INTENSIVE CARE marks on the front of the package, including their trademark registration symbols. Id. at 660-61, 666 (FF 64-68, 134-137).[2]
 
 
 93
 Defendants did argue that placing a disclaimer on the package alleviated potential confusion. But, supported by the testimony of an expert on consumer psychology, the district court specifically found that consumers rarely, if ever, pay attention to disclaimers. This is especially true if it is obscurely placed, as was defendants', in small print on the bottom rear label of the package. Conopco, at 667 (FF 140). The court further found based on this evidence that the disclaimer could actually foster confusion because the consumer would likely focus on the most well-known words in it, VASELINE and INTENSIVE CARE, and miscomprehend the disclaimer entirely. Id. at 667 (FF 141). The court also focused on the expert's testimony that "the average consumer purchasing inexpensive consumer goods, such as skin care lotions, usually reviews the product for approximately three seconds" and "only retain[s] overall impressions of product appearance, including bottle shapes and colors." Id. at 665 (FF 115).
 
 
 94
 In addition, the court found that not only were the trade marks VASELINE and INTENSIVE CARE "strong marks" but survey evidence established that a very high percentage (83%) of respondents throughout the country correctly recognized the VICL bottle even with all textual material removed except for the ingredient list. Conopco, at 665 (FF 114). That the court's detailed comparison of the products and finding that they were "substantially identical" is not clearly erroneous is self-evident from the packages themselves, many examples of which were available at trial. Id. at 665 (FF 116).[3]
 
 
 95
 These extensive findings are supported by the evidence in the record including expert testimony that the trial court found credible and persuasive and the testimony of defendants' own employees. The court's detailed comparison of the products properly included an analysis of the features asserted by defendants as reducing confusion. The court's findings on the Squirtco factors--the strength of plaintiff's trademarks and trade dress; the similarity of the products sold in direct competition; the extreme similarity between plaintiff's trade dress and defendants' packaging; and defendants' intent to mimic the VICL trade dress--all amply support its conclusions. Defendants have not established that any of these findings taken alone is clearly erroneous or that, as a whole, they are so defective as to cast doubt on the district court's conclusion about a likelihood of confusion. That the court failed to discuss every possible piece of evidence in its opinion does not render its decision defective or permit the inference that it ignored relevant evidence. See Medtronic, Inc. v. Daig Corp., 789 F.2d 903, 906, 229 USPQ 664, 667 (Fed.Cir.1986) ("We presume that a fact finder reviews all the evidence presented unless he explicitly expresses otherwise.").
 
 
 
 [1]
 At issue in the case also were formulations of the accused product at ratios of 20:1 and 40:1. However, defendants' treatment in their opening briefs of the patent infringement issue in relation to these formulations is both cursory and ambiguous. The issue is not mentioned in the 'Statement of Issues' section, and is addressed only in a footnote in the body of Ansehl's brief. Thus, defendants waived the patent infringement issue with respect to these formulations. See Becton Dickinson & Co. v. C.R. Bard, Inc., 922 F.2d 792, 800, 17 USPQ2d 1097, 1103 (Fed.Cir.1990)
 
 
 [2]
 According to Webster's Third New International Dictionary, the term means: "3 a: with some approach to exactness in quantity, number, or time: APPROXIMATELY < C four feet of snow >
 < C eight o'clock >."
 
 
 [3]
 Col. 2, 11. 19--24
 
 
 [4]
 The specification reads:
 From the foregoing [skin feel test] results it is evident that at ratios of hydrocarbon to surfactant of 40:1 to 1:1 isoparaffin-type hydrocarbon is much preferred over mineral oil.
 Col. 6, 11. 26--28.
 
 
 [5]
 See SmithKline Diagnostics Inc. v. Helena Lab. Corp., 859 F.2d 878, 882, 8 USPQ2d 1468, 1471 (Fed.Cir.1988)
 
 
 [6]
 We address these issues in relation to all three lotion formulations since there has been no assertion that the trade dress used with respect to each differed in any material respect
 
 
 [7]
 Although the Target brand is different from the Venture brand, the trial court found the labelling of the two to be substantially similar. Defendants have not shown this finding to be clearly erroneous
 
 
 [8]
 The circumstance in which the private label brand is being sold through different commercial channels than the national brand might present a different case
 
 
 [9]
 The suggestion in the dissent--that survey evidence supports the trial court's conclusion of consumer confusion--is incorrect. That survey was a 'secondary meaning' survey, designed to test whether the overall shape and coloring of the Conopco container had acquired meaning as a source-indicator. The survey did not purport to address the question of whether consumers could successfully distinguish that container from the Venture container, and thus has no relevance to the actual confusion or likelihood of confusion issues
 
 
 [10]
 Although the issue here relates to trade dress, not trademark, we assume for purposes of discussion that the rules are sufficiently analogous to make the cases relevant
 
 
 [11]
 As Ansehl's marketing director, Bill Bond, testified:
 I think ... that the Venture logo and the markets where Venture competes and has stores and the way that they merchandise and market their entire retail concept, that their logo is readily familiar to their customer base.
 The logo is everywhere in terms of Venture. It's in the parking lot. It's on the store signage. It's in their advertising vehicle. It's on television. It's everywhere.
 I've never seen it anywhere else.
 
 
 [12]
 Given the smallness of the type used, the presence of the Venture name on the face of the original Venture product does not detract from a conclusion that the Venture logo standing alone has acquired secondary meaning, and thus functions as a source indicator in connection with the relaunched Venture product
 
 
 [13]
 Since the only activity upon which we find liability--the making and selling of the 20:1 and 40:1 formulations--does not involve all the defendants, we vacate the court's determination that the imposition of joint and several liability is warranted. On remand, the court is instructed to reconsider this issue in relation to the limited scope of this activity
 
 
 [14]
 Conopco's argument, that the court's discretion in this area is curtailed by 28 U.S.C. Sec. 1338(b) (1988) and 28 U.S.C. Sec. 1367 (Supp. II 1990), is wrong. 28 U.S.C. Sec. 1338(b) is a codification of the doctrine of pendent jurisdiction as it applies to patent, trademark, and copyright causes of action. See 13B Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure Sec. 3582, at 317 (1990); 1 James W. Moore et al., Moore's Federal Practice p 0.62, at 697 (1993). See also Gilbert/Robinson Inc. v. Carrie Beverage-Missouri, Inc., 989 F.2d 985, 993, 26 USPQ2d 1378, 1384 (8th Cir.), cert. denied, --- U.S. ----, 114 S.Ct. 338, 126 L.Ed.2d 282 (1993). It does not have the significance Conopco says it does. Moreover, 28 U.S.C. Sec. 1367 applies only to civil actions commenced on or after December 1, 1990. Pub.L. No. 101-650 Sec. 310(c), 104 Stat. 5114 (1990). Thus, it has no applicability here
 
 
 [1]
 The following factors must be considered in order to determine whether a likelihood of confusion exists: (1) the strength of the plaintiff's mark; (2) the similarity of the marks; (3) the similarity of the products; (4) the competitive proximity of the products; (5) the defendants' intent; and (6) instances of actual confusion. Squirtco, 628 F.2d at 1091, 207 USPQ at 900
 
 
 [2]
 The trial court correctly explained that proof of intent to copy another's trade dress creates an inference that there is a likelihood of confusion. See Squirtco, 628 F.2d at 1091, 207 USPQ at 900. I recognize that in some instances the addition of the "Compare to ..." language used with a competitor's marks may alleviate potential confusion. See Calvin Klein Cosmetics v. Parfums de Coeur, Ltd., 824 F.2d 665, 668-69, 3 USPQ2d 1498, 1500-01 (8th Cir.1987) (limited use of trademarks in comparative advertising is permitted when the statements are truthful and non-confusing ). However, the evidence of record before the trial court, as explained more fully below, supports its conclusion that, on the facts found here, May's use of the VASELINE and INTENSIVE CARE marks was likely to cause confusion despite the addition of the comparative statement
 
 
 [3]
 It is true that evidence of idiosyncratic and mistaken belief by a consumer, such as Mrs. Sickles here, cannot support a finding of actual confusion. See Litton Systems, Inc. v. Whirlpool Corp., 728 F.2d 1423, 1447, 221 USPQ 97, 112 (Fed.Cir.1984). Nevertheless, after discounting entirely the evidence of actual confusion, the finding of likelihood of confusion is amply supported by the other evidence